IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

DAVID THOMAS, INDIVIDUALLY
AND ON BEHALF OF SIMILARLY
SITUATED INDIVIDUALS; PETE
GONZALESJR., EUNICE CARTER,
RODOLFO LOPEZ, BENJAMIN BURRS,
JOHN HERNANDEZ, RAMIRO .
ROCHA, TIMOTHY GODOY,
FRANCISCO PALAFOS, FRANCISCO
PALAFOS, TOICE WALKER, DANIEL
CERDA, JAMES ALEXANDER, FRANK
REYES, LOUIS M. YANEZIV,
ALEJANDRO CERDA, DANIEL
QUINTANILLA, DANTE FREEMAN,
JOHN RAMOS, JOSE GRACIA, JOSE
REYNA, MARCEL SWEATJR.,
NATHAN INIGUEZ-JACO, RAMON
RODRIGUEZ, RUBEN HEREDIA,
SHELBY LAVERGNE, SIERRA
SCARBOROUGH, STANLEY
JACKSON, BRADLEY HALL,
TERRANCE WILLIAMS, CHRISTIAN
RIOS, RENARD GREENFIELD, BRYAN
GAYTAN, JAYCEE GOODE, ARTHUR
RAMIREZ, MICHAEL HERNANDEZ,
RUBEN CANU, MARIO PALOMO,
STEVEN BELL,

§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§

SA-23-CV-00638-FB

*Plaintiffs,*

vs.

THE QUIKRETE COMPANIES, LLC,

*Defendant.*

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

**To the Honorable United States District Judge Fred Biery:**

This Report and Recommendation concerns the parties' cross motions for summary

judgment: Defendant's Renewed Motion for Summary Judgment [#84] and Plaintiffs' Motion

for Summary Judgment on Defendant's Motor Carrier Act Defense [#85]. All pretrial matters in

1

this case have been referred to the undersigned for disposition pursuant to Western District of Texas Local Rule CV-72 and Appendix C. The undersigned therefore has authority to enter this report and recommendation pursuant to 28 U.S.C. §§ 636(b)(1)(B). In evaluating the merits of the parties' cross-motions for summary judgment, the undersigned has also considered the parties' various responses and replies [#98, #99, #108, #109]. For the reasons set forth below, the undersigned recommends that Defendant's motion for summary judgment be granted and Plaintiffs' motion for summary judgment be denied.

## I.  Background

This is an employment case seeking the recovery of unpaid overtime compensation under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b). Plaintiff David Thomas worked as a driver for Defendant the Quikrete Company ("Quikrete"), a manufacturer of concrete and other cementitious products. According to Thomas's Complaint, he was responsible for transporting raw materials from local quarries to Quikrete's San Antonio plant for manufacturing and for transporting products from the plant to local distributors. Thomas alleges that Quikrete violated the FLSA by misclassifying him and other drivers as exempt employees and failing to pay them overtime compensation. On December 3, 2024, the Court granted Thomas's motion for notice to all current and former employees of Quikrete who worked as drivers at the San Antonio plant in the last three years [#48]. To date, approximately 50 other drivers have joined in this action.

Quikrete admits that it does not pay its drivers overtime compensation but asserts the affirmative defense of the FLSA's Motor Carrier Act ("MCA") Exemption, 29 U.S.C. § 213(b)(1). Quikrete filed an early motion for summary judgment based on the exemption, which the Court subsequently dismissed without prejudice to filing a new motion after additional discovery [#71]. Quikrete has filed a renewed summary-judgment motion, asking the Court to

grant it summary judgment on all of Plaintiffs' claims based on the MCA exemption. Plaintiffs have filed a cross-motion for summary judgment on the exemption defense, arguing that Quikrete cannot establish the applicability of the defense and that the MCA exemption does not govern this case as a matter of law. The motions are ripe for the Court's review.

## II. Summary Judgment Standard

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also* Fed. R. Civ. P. 56(c). A dispute is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The MCA exemption is an affirmative defense on which the employer bears the burden of proof. *Corning Glass Works v. Brennan*, 417 U.S. 188, 196–197 (1974). Therefore, Quikrete bears the ultimate burden of proving by the preponderance of the evidence the exemption applies. *Hobbs v. EVO Inc.*, 7 F.4th 241, 248 (5th Cir. 2021). When summary judgment is sought on an affirmative defense, as here, the movant must establish "beyond peradventure the elements of the defense." *Smith v. Reg'l Transit Auth.*, 827 F.3d 412, 420 n.4 (5th Cir. 2016). "Once the movant does so, the burden shifts to the nonmovant to establish an issue of fact that warrants trial." *Id.*

The parties may satisfy their respective burdens by tendering depositions, affidavits, and other competent evidence. *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992). The Court views the summary judgment evidence in the light most favorable to the non-movant. *Rosado v.*

*Deters*, 5 F.3d 119, 123 (5th Cir. 1993).  "After the non-movant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the non-movant, summary judgment will be granted."  *Miss. River Basin Alliance v. Westphal*, 230 F.3d 170, 174 (5th Cir. 2000).

### III.  Undisputed Facts Established by the Summary-Judgment Record

The following undisputed facts are established by the summary-judgment record. Quikrete is the largest manufacturer of pre-blended, packaged concrete and cementitious products in North America.  (Williams Decl. [#84-2], at ¶ 2.)  Quikrete sells its pre-mix concrete and other products, such as lava rock, repair caulks, and epoxies, to nationwide retailers like Home Depot, Lowe's, and Ace Hardware.  (*Id.* at ¶ 3.)  Aside from the pre-mix concrete, these products are manufactured by Quikrete at plants across the country, including in Ohio, New Mexico and Virginia.  (*Id.*)  Quikrete then supplies these related products to its local plants, such as the one it operates in San Antonio, Texas.  (*Id.* at ¶ 4; McSherry Decl. [#84-3], at ¶¶ 2–3.)

Quikrete's San Antonio plant manufactures pre-mix concrete bags and serves as a distribution point for products Quikrete ships into Texas from other states on a monthly or quarterly basis.  (Williams Decl. [#84-2], at ¶ 5; McSherry Decl. [#82-3], at ¶¶ 2, 3; Thomas Dep. [#84-4], at 58:21–60:9, 65:11–20.)  The San Antonio plant supplies local stores operated by its national customers (Home Depot, Lowe's, etc.) and hundreds of independent hardware stores in the market area to ensure their shelves are loaded with product.  (Williams Decl. [#84-2], ¶¶ 4, 5; McSherry Decl. [#84-3], at ¶ 2; Thomas Dep. [#84-4], at 58:21–60:9, 65:11–20.)  Products that are shipped into a local plant such as the San Antonio plant may be stored in that location for limited periods of time ranging from a few days to a few weeks to several months, depending on the product.  (Williams Decl. [#84-1], at ¶ 6; McSherry Decl. [#84-2], at ¶ 4; Thomas Dep. at

161:12-162:7.)  Quikrete does not process or modify the out-of-state products at the plant and does not sell directly to the general public.  (McSherry Decl. [#84-2], at ¶ 3; Sanders Decl. [#84-8], at ¶ 10.)

Quikrete hires truck drivers to deliver its products stored at the San Antonio plant to its local customers and also to transport raw materials from a local cement supplier to the plant needed to manufacture the pre-mix bags of concrete.   (Compl. [#1], at ¶ 2; Answer [#5], at ¶ 2; McSherry Decl. [#84-2], at ¶ 9; Thomas Dep. [#84-4], at 68:25–11, 71:25–72:11.)  Quikrete typically employs about 30 to 40 drivers at a given time.  (Quikrete Dep. [#84-5] at 8:9–13.)  All drivers operate trucks with a gross vehicle weight rating of 80,000 pounds but can haul three different kinds of trailers: flatbed, belly dump, and tanker.  (McSherry Decl. [#84-2], at ¶ 9; Sanders Decl. [#84-8], at ¶ 9.)

Flatbed trailers are used to haul products orders from the San Antonio plant and deliver both ready-mix concrete bags manufactured in San Antonio and out-of-state products. (McSherry Decl. [#84-3], at ¶ 10; Sanders Decl. [#84-8], at ¶ 10; Thomas Dep. [#84-4], at 68:22–24.)  Belly dump trailers are used to pick up locally-sourced raw materials from local sand and gravel pits and return those raw materials to the San Antonio plant to mix with powdered cement.  (Joint Stipulation [#31], at ¶ 3; McSherry Decl. [#84-3], at ¶ 11; Thomas Dep. [#84-4], at 66:24–13; Quikrete Dep. [#85-2], at 32:5–10l.)  Tanker trailers are used to pick up locally-sourced powdered products and deliver them to the plant where the powdered cement is combined with the sand and gravel to form Quikrete's pre-mix concrete product, which is then bagged and delivered to local retail customers on the flatbed trailers.  (McSherry Decl. [#84-8], at ¶ 12; Thomas Dep. [#84-4], at 66:14–23; Madigan Dep. [#99-16], at 9:19–21, 10:14–19.)  Although additional training is required for drivers to operate belly dump or tanker trailers, all

5

Quikrete drivers are qualified to operate flatbed trailers.  (Thomas Dep. [#84-4], at 226:7–21; Gonzales Dep. [#84-17], at 72:20–24.)

None of the named Plaintiffs or opt-in drivers, regardless of the type of trailer they operated, ever delivered products across state lines.[1]  (Madigan Dep. [#85-1], at 34:23-25.) Their driving duties were entirely intrastate, beginning and ending within Texas.  (*Id.* at 34:23– 35:3; McSherry Dep. [#99-15], at 59:2–7.)  As belly dump and tanker trailers only transported locally sourced raw materials, only those drivers hauling flatbed trailers were involved in the actual transport of products originating outside of the State of Texas.  (*See* Quikrete Dep. [#85-2], at 89:5–23.)

Quikrete is a for-hire and private motor carrier registered with the Federal Motor Carrier Safety Administration (FMCSA), an agency within the DOT, and requires all its drivers to be qualified under the FMCSA's regulations.  (Driver Job Posting [#84-5], at 37; Sanders Decl. [#84-8], ¶¶ 2–9; Thomas Dep. [#84-4], at 109:11–24, 169:12–170:6).  When Quikrete posts for its open driver positions, it advertises that it is seeking to hire a "Truck Driver" or "CDL Driver" generally.  (Quikrete Dep. [#84-5], at 12:12–17; Driver Job Posting [#84-5], at 37.)  All the Plaintiffs in this suit were employed by Quikrete during the relevant time period as drivers and were subject to the same compensation policy.  (Sanders Decl. [#84-8], at ¶ 15.)  Quikrete pays its drivers an hourly, straight-time rate for all hours worked, but driver pay depends on whether the driver hauls flatbed, belly dump, or tanker trailers that day.  (*Id.*; Thomas Dep. [#85-4], at

---

[1] Despite this testimony by several Quikrete employees, Quikrete provided the Court with contradictory evidence that at least some San Antonio drivers delivered product out of state on occasions.  (Gesch Dep. [#98-25], at 26:9–30:16.)  However, the undersigned has not relied on this evidence in resolving the parties' motions because in its response to Plaintiffs' motion to strike Gesch's testimony, Quikrete explained that it is not relying on the limited examples of interstate travel identified by Gesch in arguing the MCA exemption applies and has admitted for purposes of summary judgment that no Plaintiffs crossed state lines.  (Resp. [#114], at 4.)

132:5–9, 18–20.)  When employees haul flatbed trailers, they are paid at a lower hourly rate than when they haul tankers or belly dump trailers.  (McSherry Dep. [#84-13], at 47:13–15.)  Quikrete classifies all drivers as exempt under the MCA exemption and does not pay them overtime compensation.  (Sanders Decl. [#84-8], at ¶¶ 14–15; Madigan Dep. [#85-1], at 6:13-16; Quikrete Dep. [#85-2], at 76:10–14.)

### IV.  Analysis

Quikrete asks the Court to grant it summary judgment on all of Plaintiffs' claims arising under the FLSA based on its affirmative defense of the MCA exemption.  Plaintiffs in turn ask the Court to grant them summary judgment and hold as a matter of law that the MCA exemption does not apply to Plaintiffs because (1) the exemption does not apply to the sub-class of Plaintiffs who primarily drove belly dump and tanker trailers; and (2) even for the flatbed drivers, Quikrete cannot show that the products these drivers hauled retained their interstate nature after arriving at the San Antonio plant for indefinite storage and future delivery.  The Court should find that Plaintiffs are judicially estopped from arguing that the exemption cannot be decided on a class-wide basis as to all Quikrete drivers because they have taken directly inconsistent positions at other times in this litigation.  Further, because Quikrete has established the MCA defense as a matter of law, and Plaintiffs have not raised a genuine issue of material fact the exemption's application as to all Plaintiffs, the Court should grant Quikrete summary judgment and deny Plaintiffs' motion.

**A.**     **Plaintiffs are judicially estopped from arguing that the MCA exemption cannot be decided on a class-wide basis.**

Plaintiffs argue in their summary-judgment briefing that during the relevant time period, trailer assignments were fixed; drivers were assigned to specific trailer types; and Quikrete maintained at least three distinct driver positions with different job duties.  Plaintiffs claim that

the MCA exemption therefore fails as to all belly dump and tanker drivers, as it is undisputed that these drivers hauled only local materials from quarries and plants, so not all Plaintiffs had a reasonable expectation of being assigned to haul out-of-state product on flatbed trailers. Quikrete argues that Plaintiffs are judicially estopped from taking this position because it is inconsistent with Plaintiffs' assertions at other times in this litigation.  The undersigned agrees.

"Judicial estoppel is a common law doctrine that prevents a party from assuming inconsistent positions in litigation." *In re Superior Crewboats, Inc.*, 374 F.3d 330, 334 (5th Cir. 2004).  "Importantly, because judicial estoppel is designed to protect the judicial system, not the litigants, detrimental reliance by the party opponent is not required." *Id.*  In the Fifth Circuit, judicial estoppel applies where: (1) the party's position is clearly inconsistent with the previous one; (2) the Court accepted the party's previous position; and (3) the party did not act inadvertently. *See id.*

Quikrete's judicial estoppel argument is based on Plaintiffs' representations to the Court in their motion to authorize notice that directly contradict the arguments they are now making in their summary judgment briefing.  In the motion for notice, Plaintiffs argued that all Quikrete drivers working at the San Antonio plant were misclassified as exempt employees under the MCA exemption and all drivers "are similarly situated such that collective treatment would advance the purposes of the FLSA."  (Mot. for Notice [#42], at 12.)  Plaintiffs repeatedly asserted that this case would not involve an individualized inquiry into the exemption status of Quikrete's drivers, arguing "the exemption would apply or not apply with equal force across the unified class because all of Quikrete's Drivers are paid in the same way, have the same job description, and perform the same duties." (*Id.*)  Elsewhere in their motion for notice, Plaintiffs argued that all drivers "performed the same work," making the proposed class "similarly situated

to each other, not just practically, but with respect to any liability issues such that a trial on the merits can proceed collectively." (*Id.* at 16, 22.)  Plaintiffs stated that "no merits issues exist that depend on individualized inquiries" and that this case does not "involve[] multiple subclasses and individualized issues." (*Id.* at 14.)  In short, Plaintiffs' position was that "[a]ll workers were treated similarly by Quikrete in every significant way" and the proposed class was "uniformly managed under the same policies." (*Id.*)

Plaintiffs now assert that they have "never claimed that all drivers performed identical job duties or were universally exempt or non-exempt under the MCA" and ask the Court to consider "driver usage, assignment history, and expectations, to determine whether the exemption applies on an individualized basis" and "whether individual drivers engaged in (or could reasonably have been expected to engage in) interstate commerce." (Mot. for Summ. J. Resp. [#99], at 18–19, 29.)  Plaintiffs argue their positions are not inconsistent because their representations in their motion for notice were solely related to whether the proposed class of all San Antonio Quikrete drivers was similarly situated in terms of pay policy, not individualized driver duties.

This position cannot be squared with Plaintiffs' assertions in their motion for notice, as the quotes above demonstrate.  Plaintiffs knew at the time they filed their motion for notice that the affirmative defense of the MCA exemption was going to be the merits issue litigated by the parties in this case.  Plaintiffs expressly argued that the exemption did not require an individualized inquiry because Plaintiffs were not just similarly situated in terms of pay policy (being classified as exempt) but also due to all Quikrete drivers having the same job duties (drivers for Quikrete's San Antonio plant, who drove trucks that hauled three types of trailers). In short, Plaintiffs have taken inconsistent positions in this suit.

As to the second requirement, the Court plainly accepted Plaintiffs' representations when it authorized notice.  At the time the Court issued notice, Quikrete had already filed its earlier motion for summary judgment on the MCA exemption.  The precise question before the Court in issuing notice was whether, under *Swales*, the merits issue of the MCA exemption could be decided collectively or whether analyzing the exemption would require "a highly individualized inquiry into each potential opt-in's circumstances."  *See Swales v. KLLM Transport Servs., LLC*, 985 F.3d 430, 442 (5th Cir. 2021).  In finding the former, the Court relied directly on Plaintiffs' representations that the MCA exemption could be decided collectively.  (Order on Notice [#58], at 4 ("The parties agree here that Quikrete's drivers are similarly situated ***as to their duties*** and compensation and that the merits of this case can be decided collectively." (emphasis added)).  Absent the Court's acceptance of Plaintiffs' representations in the motion for notice, the Court either would not have authorized notice at all or would have only authorized notice to a smaller subset of drivers.

Third, in changing their argument at summary judgment, Plaintiffs have not acted inadvertently.  Plaintiffs argue that they are only shifting their arguments based on Quikrete's evolving legal positions throughout the course of this case.  This is not a defensible position. Quikrete has consistently stood on its MCA exemption defense from the outset of this case and filed an early summary judgment motion making the same arguments it asserts now in its renewed motion.  It is Plaintiffs who have shifted their position from unequivocally arguing that any distinction between the job duties of Quikrete's drivers (based on trailer type hauled or otherwise) is immaterial to the MCA exemption analysis to arguing the exemption cannot be decided at summary judgment because an individualized inquiry is required.

10

Finally, although Quikrete is not required to show it has suffered prejudice, allowing Plaintiffs to make an individualized argument at summary judgment would without question result in prejudice to Quikrete. Had Quikrete known Plaintiffs would argue for an individualized assessment of each opt-in plaintiff, it would have had a stronger basis to contest the scope of notice to be issued, and it could have insisted on taking each opt-in plaintiff's deposition and engaged in more individualized written discovery. In sum, Plaintiffs are judicially estopped from arguing that the resolution of the parties' dispute over the MCA exemption requires an individualized inquiry.

**B.    Alternatively, collective treatment of the MCA exemption is appropriate in this case under governing Fifth Circuit standards.**

Quikrete argues that even if Plaintiffs' representations on the individualized nature of the exemption were not barred on judicial-estoppel grounds, Fifth Circuit precedent provides for the treatment of the MCA exemption in this case on a collective basis. The Fifth Circuit does not analyze the exemption's application on a week-by-week or employee-by-employee basis. *Kelley v. Alpine Site Servs., Inc.*, 110 F.4th 812, 816 (5th Cir. 2024); *Songer v. Dillon Res., Inc.*, 618 F.3d 467, 475 (5th Cir. 2010), *abrogated on other grounds by Encino Motorcars, L.L.C. v. Navarro*, 584 U.S. 79 (2018). Rather, if a driver engages in interstate commerce or could reasonably be expected to, then the exemption applies to all workweeks. *Kelley*, 110 F.4th at 816. "There is no specific, minimum frequency with which an employee must engage in work to which the MCA exemption would apply." *Id.* The Fifth Circuit has explained that "[b]ecause the work is evaluated on a class-wide basis, we also agree that the MCA exemption can apply 'to employees who rarely, or never engage in' safety-affecting activities." *Id.* (citation omitted).

The Fifth Circuit's reasoning comports with the regulations governing the FLSA and its exemptions, which provide that "if the bona fide duties of the job performed by the employee"

11

subject the employee to be or to likely be "called upon in the ordinary course of his work to perform, either regularly or from time to time, safety-affecting activities . . . he comes within the exemption in all workweeks when he is employed at such job." 29 C.F.R. § 782.2(b)(3). This "rule applies regardless of the proportion of the employee's time or of his activities which is actually devoted to such safety-affecting work . . . and the exemption will be applicable even in a workweek when the employee happens to perform no work directly affecting 'safety of operation.'" *Id.*; *see also Rychorcewicz v. Welltec, Inc.*, 768 F. App'x 252, 255–56 (5th Cir. 2019) ("Even if a few individual class members (here, 5 out of the 52) never drive interstate, that is not the relevant inquiry. Instead, we consider whether field engineers, on a company-wide basis, could reasonably have been expected to drive in interstate commerce consistent with their job duties.") (internal quotation and citation omitted).

Plaintiffs argue that all Quikrete drivers were not expected to drive in interstate commerce (i.e., to haul flatbed trailers) until Quikrete changed its policy to assign drivers to different trailer types as needed from a generalized "driver pool" after this lawsuit was filed. Yet, Julia Frazier, Office Manager of the San Antonio plant during the relevant period, stated in her declaration that she was responsible for assigning belly dump and tanker drivers to pick up flatbed loads for a number of reasons, such as when their belly dump or tanker unit was down for maintenance. (Frazier Decl. [#99-1], at ¶ 36.) Several Plaintiffs provided consistent testimony—that when their assigned equipment was in the shop, they sometimes hauled flatbed trailers, even before the alleged policy change. (Yanez Decl. [#99-4], at ¶¶ 22–24; Cantu Decl. [#99-5], at ¶ 13; Godoy Dep. [#84-9], at 37:4–17; Lopez Dep. [#84-18], at 103:15–18.) This is consistent with Quikrete's records that numerous Plaintiffs who typically drove belly dump or tanker trucks also drove flatbed trucks during the relevant period. Plaintiff Yanez hauled 113

flatbed loads; Plaintiff Cantu hauled 19 flatbed loads; Plaintiff Godoy hauled 1,508 flatbed loads; Plaintiff Lopez hauled 102 flatbed loads; and Plaintiff Thomas hauled seven flatbed loads. (McSherry Decl. [#84-3], at ¶¶ 17, 20; Gesch Second Supp. Decl. [#108-3], at ¶¶ 4, 6,16; Cantu TMS Report [#108-3], at 227; Godoy TMS Report [#98-11] at 21–42; Lopez TMS Report [#84-15], at 4–6.)  And numerous Plaintiffs only or primarily hauled flatbed trailers.  (Gonzales Dep. [#84-17], at 26:19–20; Palafos Dep. [#84-19], at 25:1–3; Walker Dep. [#84-21], at 77:1–9; Burrs Dep. [#23], at 20:23–21:1.)

Plaintiffs argue that all Quikrete drivers were not reasonably expected to haul flatbed loads because, prior to the alleged policy change, belly dump and tanker drivers had a choice whether to accept a flatbed assignment when their truck was down for maintenance.  (*See, e.g.*, Yanez Decl. [#99-4], at ¶¶ 22–24.)  According to several Plaintiffs, each driver could accept a request to pick up a flatbed load or elect to take the day off work without pay—meaning their reassignment was voluntary.  (*Id.*)  According to Plaintiffs, this testimony precludes application of the MCA exemption on a class-wide basis to all Quikrete drivers.

This argument is not persuasive for several reasons.  The Fifth Circuit has applied a multi-factor test to evaluating whether an a class of employees has a "reasonable expectation" of interstate transportation, without any one factor being dispositive.  *Olibas v. Barclay*, 838 F.3d 442, 448–49 & n.11 (5th Cir. 2016).  These factors include: (1) whether all employees in the class have similar job duties, even if only some employees in the class make interstate trips; (2) whether the employer regularly sends some drivers to interstate destinations; (3) whether the employer requires its drivers to meet DOT requirements; (4) whether and with what frequency project assignments are subject to change; (5) whether the drivers' assignments are given via dispatch based on customer need; (6) whether drivers have fixed or dedicated routes; (7) whether

assignments are distributed indiscriminately; and (8) whether drivers risk termination for refusing trips from dispatch. *Id.*

Here, these factors cut against Plaintiffs' argument, and a reasonable fact finder would not find otherwise. It is undisputed that all Quikrete drivers have similar job duties, even if on any given day or during some weeks, only some drivers haul loads involving out-of-state product; Quikrete's driver pool in San Antonio includes drivers who regularly transport out-of-state product; and Quikrete requires all its driver to meet DOT requirements. This evidence establishes that "the [DOT] had the power to regulate all of [Quikrete's] drivers" because "the *existence*—rather than the *exercise*—of that power is the test as to whether the employees were entitled to overtime pay under the FLSA." *Songer*, 618 F.3d at 474 (emphasis in original).

Moreover, there is undisputed evidence that there were other reasons aside form a belly dump or tanker truck being in the shop for driver reassignments. Plaintiff Eunice Carter stated in her declaration that, although there were not typically reassignments between trailer types on a daily basis, Quikrete would reassign belly dump and tanker drivers to flatbed trailers if a flatbed driver called out sick and there were not enough flatbed drivers available. (Carter Decl. [#99-11], at ¶ 14.) And none of Plaintiffs' witnesses have disputed Quikrete's witnesses' testimony that belly dump or tanker drivers could be called on to haul flatbed trailers when Quikrete's raw materials vendors were closed for holidays or when there are weather events like hurricanes leading to increased orders. (Sanders Decl. [#84-8], at ¶ 11; McSherry Decl. [#98-3], at ¶ 14.)

Plaintiffs repeatedly argue that there was additional training required for drivers to be "promoted" to belly dump or tanker drivers and that these positions were available on basis of seniority. (*See, e.g.*, Thomas Dep. [#84-4], at 226:7–21.) Yet there is no converse evidence that a belly dump or tanker driver was not qualified to drive or could not be assigned to haul a flatbed

14

load.  No additional training was required for this role.  (Gonzales Dep. [#84-17], at 72:20–24.) That some discrete Plaintiffs may not have ever driven a flatbed load during the relevant period does not render the MCA exemption defense unavailable to be adjudicated on a collective basis. "To be sure, when evaluating the nature of work from a class-wide perspective, [the Fifth Circuit does] not require a particularly high concentration of qualifying work in order to meet the MCA exception."  *Amaya v. NOYPI Movers, L.L.C.*, 741 F. App'x 203, 206 (5th Cir. 2018).  The exemption has been applied on a class-wide basis even where only 2.75 percent of a trips driven by a class were interstate, *see Songer*, 618 F.3d at 475–76, and where only about 4 percent of the work of a class of drivers involved services in interstate commerce, *Morris v. McComb*, 332 U.S. 422, 432–34 (1947).

In sum, the summary-judgment evidence establishes that there were several reasons that drivers typically assigned to haul belly dump and tanker trailers would be asked to drive flatbed loads containing out-of-state product, and that many of the Plaintiffs in this suit did in fact perform such work during the relevant period.  The "safety-affecting activities" were not "so trivial, casual, and insignificant as to be de minimis," such that the exemption does not apply. *See Amaya*, 741 F. App'x at 206 (denying summary judgment for employer on MCA exemption defense where evidence showed that class of workers hired to install office cubicles (furniture-installers) were "hardly ever" called upon to load trucks crossing state borders).  Based on this undisputed evidence, Quikrete has established that all its drivers, even those who primarily drove belly dump and tanker trailers, reasonably could be expected to drive flatbed trucks containing materials originating from out of state.

C.      **FLSA Framework and the MCA Exemption**

The FLSA provides the minimum wage and overtime pay requirements of employers engaged in interstate commerce. *See* 29 U.S.C. §§ 206, 207. Under § 216(b), a qualifying employer who fails to pay a non-exempt employee the federally mandated minimum wage and/or one-and-one-half times the employee's regular rate of pay for work completed over forty hours per week commits a violation of the FLSA and is liable to the employee for unpaid overtime compensation.

The FLSA exempts from regulation, however, "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of" the MCA. 29 U.S.C. § 213(b)(1). The exemption serves to prevent dual regulation of commercial drivers by both the Department of Labor ("DOL") and the Department of Transportation ("DOT"), and to "ensure that operators of vehicles affecting highway safety [are] regulated by an entity with a greater understanding of the particular safety concerns." *Carley v. Crest Pumping Techs., L.L.C.*, 890 F.3d 575, 579 (5th Cir. 2018); *see also Shew v. Southland Corp.*, 370 F.2d 376, 380 (5th Cir. 1966).

The Supreme Court has instructed the federal courts to give FLSA exemptions a "fair reading," not a narrow one. *Encino Motorcars*, 579 U.S. at 89. As to the MCA exemption specifically, courts have observed that narrowly interpreting the exemption would "undermine [DOT's] safety regulations" by "encouraging drivers to earn overtime" by working more hours, rather than "limit[ing] the number of continuous hours drivers may be on the road." *Glanville v. Dupar, Inc.*, No. CIV.A. H-08-2537, 2009 WL 3255292, at *3 (S.D. Tex. Sept. 25, 2009). The Fifth Circuit has expressly recognized that the MCA exemption "should . . . be broadly

construed" to preserve the MCA's safety goals. *Galbreath v. Gulf Oil Corp.*, 413 F.2d 941, 946 (5th Cir. 1969).

There are two criteria that must be met for an employee to qualify for the MCA exemption: (1) the employee must be employed by carriers whose transportation of passengers or property by motor vehicle is subject to the jurisdiction of the DOT under section 204 of the MCA; and (2) the employee must engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the MCA. *Escobedo v. Ace Gathering, Inc.*, 109 F.4th 831, 834 (5th Cir. 2024) (citing 29 C.F.R. § 782.2(a)).

In this case, the parties do not dispute that Plaintiffs are employed by carriers whose transportation of property is subject to DOT jurisdiction and therefore satisfy the first exemption requirement or that Plaintiffs were engaged in "safety-affecting activities" under the exemption's second requirement. Quikrete has submitted sufficient evidence to carry its burden on this point as well. (*See* Sanders Decl. [#84-8], at ¶¶ 2–9.) The dispute in this case is exclusively over whether Plaintiffs were engaged in interstate commerce, even though they never hauled raw materials or cementitious products across state lines.

"The MCA defines interstate commerce as, simply, transportation between a place in a State and a place in another State," but this definition "has not been applied literally by the courts." *Escobedo*, 109 F.4th at 834–35 (quoting 49 U.S.C. § 13501(a)) (additional citation omitted). The Fifth Circuit has long applied the MCA exemption not only to the actual transport of goods across state lines but also to "the intrastate transport of goods in the flow of interstate commerce." *Songer*, 618 F.3d at 472. A carrier can be engaged in interstate commerce when transporting goods "*ultimately bound* for destinations beyond Texas, even though the route of the

17

particular carrier is wholly within one state." *Escobedo*, 109 F.4th at 835 (quoting *Merchants Fast Motor Lines, Inc. v. ICC*, 528 F.2d 1042, 1044 (5th Cir. 1976) (emphasis added)). "Indeed, so long as 'goods carried are in the course of through transit" to or from another state, the Fifth Circuit has observed, "[t]raffic need not physically cross state lines to be in interstate commerce.'" *Id.* (quoting *Merchants Fast Motor Lines*, 528 F.2d at 1044).

In some cases, the application of these principles is straightforward. For instance, the Supreme Court held in *United States v. Capital Transit Co.* that the transportation of passengers solely within the geographic boundaries of Washington D.C. on an "intra-District streetcar and bus" constituted interstate commerce because the passengers were "going to and from Virginia establishments" and were therefore engaged in "interstate movement." *Id.* (quoting 338 U.S. 286, 290 (1949)). And more recently in *Escobedo,* the Fifth Circuit reached the "straightforward" conclusion that the transportation of crude oil solely within the State of Texas was nonetheless interstate commerce under the MCA because the oil was "ultimately bound for out-of-state destinations," either being traded on the export market for other countries or refined in refineries in other states, like Louisiana. 109 F.4th at 835–36.

The inquiry becomes more complicated where, as here, there is evidence that the product being shipped is temporarily stored in a warehouse or other facility during its interstate journey. In such circumstances, the Fifth Circuit has directed courts to evaluate the "fixed-and-persisting-intent" of the shipper at the time of shipment to determine whether the "essential character" of the shipment remains interstate throughout the entirety of its journey. *Id.* at 836–37 (discussing line of cases applying "fixed-and-persisting-intent" test). Under this line of cases, where a product originates out of state and temporarily rests in a warehouse or company "hub," "the later hub-to-customer or warehouse-to-customer transport" can still be "interstate in character, even

18

though it did not again cross state lines" where there is a demonstrable intent to move those goods continuously in interstate commerce. *State of Tex. v. United States*, 866 F.2d 1546, 1561 (5th Cir. 1989).

Although the parties agree that the fixed-and-persisting-intent test is relevant to the Court's inquiry here, they disagree as to what factors the Court should consider in evaluating the "essential character" of the shipments at issue. Plaintiffs repeatedly cite the three-part test devised by the Interstate Commerce Commission ("I.C.C.") in the 1950s, which was incorporated into DOL regulations.[2] *See* 29 C.F.R. § 782.7(b)(2). "Under that test, the major factors that could preclude single-state transportation from being considered interstate in nature are (1) that there is no specific order destined for a specific destination; (2) that the terminal storage is a distribution point or local marketing facility; and (3) that transportation from hub to spoke is arranged only after sale or allocation from storage." *Cent. Freight Lines v. I.C.C.*, 899 F.2d 413, 421 (5th Cir. 1990) (quoting 29 C.F.R. § 782.7(b)(2)).

However, as noted by Quikrete in its filings, this is not a complete, accurate statement of the test that is currently applied by the Fifth Circuit. In more recent years, the DOT has supplemented the I.C.C. three-part test with additional factors regarding the shipper's intent drawn from "case law that developed subsequent to the cases upon which section 782.7(b) was based." U.S. Dep't of Labor, Opinion Letter Fair Labor Standards Act (FLSA), 2005 WL 330602, at *2 (Jan. 11, 2005). These additional criteria are set forth in a 1992 Policy Statement issued by the I.C.C. and are to be considered in situations involving "minor traffic moving from warehouses or similar facilities to points in the same State after or preceding a movement from another State." Policy Statement, 8 I.C.C. 2d 470, 1992 WL 122949 (April 27, 1992), further

---

[2] The I.C.C. regulated motor carrier safety prior to the Secretary of Transportation. *See* I.C.C. Termination Act of 1995, Pub. L. No. 104–88, 109 Stat. 803, 804 (1995).

codified at 57 Fed. Reg. 19,812, 1992 WL 93608 (May 8, 1992)). The Fifth Circuit has rejected as outdated the I.C.C. three-factor test, noting it is too limited under circumstances such as those present here. *See Ash v. Flowers Foods, Inc.*, No. 23-30356, 2024 WL 1329970, at *3 (5th Cir. Mar. 28, 2024) ("[T]his court has already rejected that test under similar facts" because the three-factor test has been "supplemented" by additional criteria in favor of a more overarching "fixed and persisting transportation intent test.").

The 1992 Policy Statement, DOL guidance, and Fifth Circuit precedent all emphasize an approach taking into consideration the totality of the facts and circumstances surrounding the transportation in determining a shipment's essential character and the intent of the shipper. *See, e.g., Ash*, 2024 WL 11329970, at *2; *Merchants Fast Motor Lines*, 5 F.3d at 917; DOL Opinion Letter, 2005 WL 330602, at *2. The 1992 Policy Statement specifies seven factors to consider in determining whether the essential character of the shipments transported by Plaintiffs for Quikrete were interstate:

1) Even if a shipper does not know the ultimate destination of specific shipments, it bases its determination on the total volume to be shipped through the warehouse on projections of customer demand that have some factual basis, rather than a mere plan to solicit future sales within the State. This may include, but is not limited to, historical sales in the State, actual present orders, and relevant market surveys of need.

2) No processing or substantial product modification of substance occurs at the warehouse or distribution center. However, repackaging or reconfiguring (secondary packaging) may be performed.

3) While in the warehouse, the merchandise is subject to the shipper's control and direction to the subsequent transportation.

4) Modern tracking systems allow tracking and documentation of most, if not all, of the shipments coming in and going out of the warehouse or distribution center.

5) The shipper or consignee must bear the ultimate payment for transportation charges even if the warehouse or distribution center directly pays the transportation charges to the carrier.

20

6)  The warehouse utilized is owned by the shipper.

7)  The shipments move through the warehouse pursuant to a storage in transit provision.

DOL Opinion Letter, 2005 WL 330602, at *2–3 (citing 57 Fed. Reg. at 19813).  No one factor is dispositive.  The Court therefore considers these factors, as well as the totality of the circumstances, in evaluating whether Quikrete had the fixed and persisting intent to transport its goods in interstate commerce, which is the ultimate inquiry.

**D.    Quikrete has established that it is entitled to summary judgment on the MCA exemption because the totality of the circumstances establish that there is no genuine dispute of material fact as to the interstate nature of its shipments.**

Considering the totality of the circumstances, Quikrete has established beyond peradventure that it had the fixed and persisting intent to transport its goods in interstate commerce and that its shipments retain their interstate character throughout the entirety of their journey to the San Antonio plant and on to Quikrete's local San Antonio customers.  *See Escobedo*, 109 F.4th at 834; *State of Tex.*, 866 F.2d at 1561.  A reasonable fact finder considering all seven factors would conclude as a matter of law that the essential character of Quikrete's products remains interstate even after coming to rest for a period of time at the San Antonio plant.

First, it is undisputed that the products shipped to Quikrete's San Antonio facility are not processed or modified in any way during their temporary storage and remain subject to Quikrete's control and direction at all times until final delivery to Quikrete's local customers, as Quikrete owns the San Antonio facility.  (McSherry Decl. [#84-3], at ¶¶ 1, 3; Williams Decl. [#84-2], at ¶ 5.)  Accordingly, Factors Two, Three, and Six all support Quikrete's assertion that its intent at the time of shipment is to transport its goods from point of origin to customer.

21

Additionally, it is undisputed that Quikrete uses a modern inventory system, JD Edwards, to track its shipments and inventory levels (Factor Four).  (Madigan Dep. [#84-6], at 29:22–30:9; McSherry Dep. [#84-13], at 62:23–63:6.)  According to Kristopher McSherry, the current Plant Manager of the San Antonio plant, the JD Edwards system tracks the amount of a given product and how long the product has been stored in the warehouse, i.e., the average turnover rate for a specific product.  (McSherry Decl. [#84-3], at ¶¶ 1, 5.)  According to McSherry, this form of tracking is essential to Quikrete's business model, which delivers shipments to local customers on a first-in/first-out basis in order to ensure products are delivered prior to their expiration date, which is usually between six to 12 months.  (*Id.* at ¶ 8.)  However, Quikrete concedes that its inventory system only tracks items through arrival at the San Antonio plant and does not follow specific product all the way to its customers.  (Quikrete Dep. [#85-2], at 54:11–19 (explaining that it can track the arrival of a specific item but not when that same exact item leaves the warehouse for delivery).  This factor also weighs in favor of finding the character of the shipments to be interstate.  Factors five and seven are not applicable here.

This leaves the first factor, which considers whether Quikrete bases its determination of the total volume to be shipped through the San Antonio plant on projections of customer demand that have some "factual basis," rather than a mere plan to solicit future sales in the San Antonio area.  DOL Opinion Letter, 2005 WL 330602, at *2–3.  This is the primary factual dispute between the parties.  Quikrete has presented the Court with substantial evidence that its shipments to San Antonio from outside of Texas are based on historical sales data and projected sales to its existing national and local customers in the area in the form of declarations from key Quikrete employees.  Quikrete's Regional Operations Manager for South Texas, Donald Sanders, testified that each year the Regional Sales Vice President prepares a forecast reflecting

the quantity of each Quikrete product the company expects to sell customers, by month, for the following year.  (Sanders Supp. Decl. [#98-26], at ¶ 3.)  Randy Williams, Senior Vice President for Sales National Accounts also testified that Quikrete uses past sales history and future sales forecasts for a given facility to determine how much of a given product to ship in from out of state.  (Williams Decl. [#98-2], at ¶ 7.)  Moreover, several witnesses testified that every shipment to the San Antonio plant is intended to be delivered to longstanding local retail customers and known markets, not for potential future sales to unknown customers or the general public.  (*Id.* at ¶¶ 3, 7; McSherry Decl. [#98-3], at ¶ 3; Sanders Supp. Decl. [#98-26], at ¶ 5.)  Quikrete also supplied the court with a copy of its forecast for San Antonio for the years 2022 through 2024.  (Sanders Supp. Decl. [#98-26], at ¶ 3; Product Report [#98-26], at 5–15.)   This report summarizes the units of various Quikrete products sold for each of the three years for the relevant period.  (Product Report [#98-26], at 5–15.)

Plaintiffs argue that Quikrete's evidence fails to show that it used "customer-specific forecasts or predictive models to initiate its shipments to the San Antonio plant."  Yet this is not the standard.  Rather than needing to earmark specific shipments for specific customers, Quikrete need only have "some factual basis" for the amount of its shipments, which, per the 1992 Policy Statement, can include "historic sales in the State, actual present orders, [or] relevant market surveys of need."  Moreover, Quikrete "need not know the exact identity of particular consumers in order to intend that the goods move continuously in interstate commerce."  *Cent. Freight Lines*, 899 F.2d at 421; *see also Ash*, 2024 WL 1329970, at *2 ("Even if Flowers did not know at the time of production which customers would ultimately receive which goods, it knew that the products were shipped into Louisiana for distribution to Louisiana customers.").  There is no evidence that suggests that this is a case in which Quikrete ships its products into Texas with a

mere hope to "solicit future sales within the State" at some later date. *See* Policy Statement, 1992 WL 122949, at *2. Quikrete's goal is always to ship "100 percent complete," meaning it can fill any customer's order whenever additional product is needed and keep the shelves of its local customers stocked with product. (Williams Dep. [#108-2], at 51:5–52:3.)

Plaintiffs also argue that Quikrete cannot prevail on its MCA exemption defense because it has not produced a single bill of lading, purchase order, routing sheet, or internal planning record showing that Plaintiffs' deliveries fulfilled a preexisting interstate shipment. This argument is an extension of Plaintiffs' argument that Quikrete must link its interstate shipments to particular customers. It is undisputed that Quikrete does not earmark or track specific products and shipments from out of state to the shelves of its customers, and Quikrete concedes that its interstate shipments serve the purpose of "replenish[ing] [its] inventory." (*See* Quikrete Dep. [#85-2], at 54:11–19, 56:19–22.) This concession is not material. Again, Quikrete need not establish that its shipments were based on a preexisting order from a specific customer to demonstrate the interstate nature of its shipments, only that there is "some factual basis" for the volume of its shipments such that the delivery leg to local customers was part of a "practical continuity of movement" across state lines. *See* Policy Statement, 1992 WL 122949, at *2; *Ash*, 2024 WL 1329970, at *2 (finding shipper's intent to move goods in interstate commerce where products were ordered "based on sales history and projections for particular stores").[3]

---

[3] Plaintiffs cite *Ash* throughout their briefing as standing for the proposition that bread products stored in local warehouses for various lengths of time were *not* in a continuous stream of interstate commerce because they were held in storage "without a fixed and persisting intent to ship to a particular customer." (*See, e.g.*, Resp. [#99], at 10.) *Ash* held precisely the opposite. In *Ash*, the Fifth Circuit affirmed the district court's grant of summary judgment in favor of the shipper based on the MCA exemption, finding that the totality of the circumstances supported a finding that there was a fixed intent to move the bread products in interstate commerce. Not only do Plaintiffs blatantly misrepresent the Fifth Circuit's holding in *Ash*, but they also manufacture or cite hallucinated quotations not appearing in the opinion.

Plaintiffs also argue that the fact that Quikrete pulls older products to be delivered first also weighs against finding the essential character of the product at issue being interstate. (*See* Williams Dep. [#85-5], at 45:11–46:4.) Yet Plaintiffs do not cite any authority, binding or persuasive, to support why this would matter. And courts have repeatedly found that a product remains in interstate commerce even when delivered according to a "first in/first out" process. *See, e.g.*, *Deherrera v. Decker Truck Line, Inc.*, 820 F.3d 1147, 1152 (10th Cir. 2016); *Ehrlich v. Rich Prods. Corp.*, 767 F. App'x 845, 849 (11th Cir. 2019) (same).

Zooming out, what Plaintiffs are asking is for the Court to find that the San Antonio plant was not a temporary holding facility but a general inventory warehouse. Plaintiffs argue that products arriving out of state were routinely held at the San Antonio plant, sometimes for months, and were distributed based on demand, which severed any continuity of movement in interstate commerce. Yet there is no limit on the amount of time a product can be temporarily stored before continuing its interstate journey. *See Merchants Fast Motor Lines*, 5 F.3d at 915–17 (upholding interstate determination even though some goods stayed in warehouse more than a year). The MCA expressly includes "storage" as part of its definition of "transportation." *Ash*, 2024 WL 1329970, at *3. And the Fifth Circuit has not ever found that the fact that an out-of-state shipment comes to rest for a significant time at a warehouse before being delivered to local customers destroys its interstate character. To the contrary, the Fifth Circuit found that carpet shipped from Georgia to a service center in Texas retained its interstate nature despite sitting in the service center for between two to three months before being shipped to customers. *State of Tex.*, 866 F.2d at 1549, 1560–61 (finding I.C.C.'s determination that hub-to-customer transport was still interstate in character was not arbitrary and capricious where shipments were based on

25

projections from past dealings with major customers accounting for 80 percent of the company's sales).

Finally, the primary evidence Plaintiffs rely upon to argue that this factor squarely cuts in favor of finding that the shipments did not retain their interstate character is the declarations of various Quikrete employees regarding the use of forecasting to determine the amount of its shipments. Plaintiffs' summary-judgment evidence includes the declaration of Julia Frazier, who served as Office Manager and acting Plant Manager from February 2020 until March 2023 (during the relevant period). (Frazier Decl. [#99-1], at ¶ 2.) According to Frazier, she was responsible for managing payroll, accounts payable and receivable, employee onboarding and hiring, driver dispatch coordination, monitoring plant inventory and storage practices, customer order processing, and the day-to-day internal operations of the San Antonio facility. (*Id.* at ¶¶ 3, 10.) Frazier testified that as acting Plant Manager, she never saw Quikrete use past sales history or future sales forecasts to determine how much of a given product to ship in from out of state, and there was no documentation or system that linked inventory restocking to pending or anticipated customer orders. (*Id.* at ¶¶ 13, 17.) Instead, per Frazier, the plant maintained what was internally referred to as a "baseline stock level" or "replenishment threshold" set annually by corporate manager that did not materially change from year to year during her tenure. (*Id.* at ¶ 14.) Quikrete asks the Court to disregard this testimony, however, because Sanders, Quikrete's Regional Operations Manager, testified that Frazier was (1) never appointed to serve as interim or acting Plant Manager; (2) was never involved in Quikrete's forecasting process so never received copies of forecasts; and (3) was never responsible for any inventory planning. (Sanders Second Supp. Decl. [#108-1], at ¶¶ 4, 7–8.) Even if the Court accepts Frazier's testimony that she never saw forecasts used at the San Antonio plant during her time working there, whether

26

Quikrete bases its determination on projections of customer demand is only one factor in the totality of the circumstances surrounding the nature of its shipments. Even if a reasonable factfinder could find that this factor cuts in favor of Plaintiffs' position, a reasonable factfinder would still conclude, based on the weight of the other factors and the totality of the circumstances, that the goods retain their interstate character.

Ultimately, this Court is required to construe the MCA exemption broadly. *Galbreath*, 413 F.2d at 946. Quikrete has always required its drivers to be qualified under FMCSA's regulations and treated its drivers as subject to the FMCSA's jurisdiction (Sanders Decl. [#84-8], at ¶ 13), and Plaintiffs' work as truck drivers directly affects the safety of motor vehicles in the transportation of property on public highways. *Escobedo*, 109 F.4th at 834. As to the interstate commerce requirement, the factors identified in the 1992 Policy Statement as a matter of law weigh in favor of finding that Quikrete had the fixed and persistent intent to deliver its out-of-state products to its existing customers in the San Antonio area. None of the evidence presented by Plaintiffs would allow a reasonable factfinder to reach the opposite conclusion, even assuming the evidence generates a fact dispute on one or two factors.

There is therefore no genuine dispute of material fact that Quikrete, by transporting out-of-state product from its San Antonio plant to local customers, was engaged in the continuous flow of interstate commerce. Quikrete has satisfied its burden to demonstrate that both elements of the MCA exemption apply and that Plaintiffs were properly classified as exempt from the overtime-compensation requirements of the FLSA. Because the undersigned recommends that Quikrete be granted summary judgment as to all of Plaintiffs' claims, the Court need not consider Quikrete's alternative argument that it be granted summary judgment as to the claims of the five Plaintiffs who failed to appear for their depositions.

## V.  Conclusion and Recommendation

Having considered the parties' motions, responses, and replies, and the evidentiary record before the Court, it is **recommended** that Defendant's Renewed Motion for Summary Judgment [#84] be **granted** and Plaintiffs' Motion for Summary Judgment on Defendant's Motor Carrier Act Defense [#85] be **denied**.

## VI.  Instructions for Service and Notice of Right to Object/Appeal

The United States District Clerk shall serve a copy of this report and recommendation on all parties by either (1) electronic transmittal to all parties represented by attorneys registered as a "filing user" with the clerk of court, or (2) by mailing a copy to those not registered by certified mail, return receipt requested.  Written objections to this report and recommendation must be filed **within fourteen (14) days** after being served with a copy of same, unless this time period is modified by the district court.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  The party shall file the objections with the Clerk of Court and serve the objections on all other parties.  A party filing objections must specifically identify those findings, conclusions or recommendations to which objections are being made and the basis for such objections; the district court need not consider frivolous, conclusive or general objections.  A party's failure to file written objections to the proposed findings, conclusions and recommendations contained in this report shall bar the party from a *de novo* determination by the district court.  *Thomas v. Arn*, 474 U.S. 140, 149–52 (1985); *Acuña v. Brown & Root, Inc.,* 200 F.3d 335, 340 (5th Cir. 2000).  Additionally, failure to file timely written objections to the proposed findings, conclusions and recommendations contained in this report and recommendation shall bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the un-objected-to proposed factual findings and legal conclusions accepted by the district court.  *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415,

28

1428–29 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1).

SIGNED this 26th day of February, 2026.

ELIZABETH S. ("BETSY") CHESTNEY
UNITED STATES MAGISTRATE JUDGE

29