**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **DAVID THOMAS, individually and on behalf of similarly situated individuals** | § § § § | |
| **Plaintiff** | § § § | **CIVIL ACTION NO. 5:23-cv-00638-FB** |
| **v.** | § § § | |
| **THE QUIKRETE COMPANIES, LLC** | § § | |
| **Defendant** | § § § | |

<u>**PLAINTIFFS' OBJECTIONS TO THE REPORT AND RECOMMENDATION**</u>

TO THE HONORABLE FRED BIERY, UNITED STATES DISTRICT JUDGE:

Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), Plaintiffs respectfully submit these Objections to the Report and Recommendation entered by United States Magistrate Judge Elizabeth S. Chestney on February 26, 2026 [Doc. 119] (the "Report" or "R&R").

1. **Objection: "Based on this undisputed evidence, Quikrete has established that all its drivers, even those who primarily drove belly dump and tanker trailers, reasonably could be expected to drive flatbed trucks containing materials originating from out of state."** *See* **R&R p. 15.**

Plaintiffs object to the R&R's finding at page 15 that all drivers could "reasonably be expected" to haul flatbed loads because the record contains sworn testimony permitting the opposite inference, that cross-assignments from belly dump and tanker work to flatbed deliveries were voluntary and could be declined without consequence. The R&R itself acknowledges evidence that cross-assignments were optional. As the R&R summarizes:

> "*According to several Plaintiffs, each driver could accept a request to pick up a flatbed load or elect to take the day off work without pay—meaning their reassignment was voluntary.*" *See* **R&R p. 13.**

1

A "reasonable expectation" that drivers will perform interstate work presupposes that the employer has authority to require such assignments as part of the job. Evidence that drivers could decline flatbed work and simply take the day off permits the inference that flatbed hauling was optional rather than an ordinary duty of belly dump and tanker drivers.

The R&R also cites Opt-In Plaintiff Eunice Carter's declaration in discussing cross-assignments. *See* **R&R p. 14 (citing Carter Decl. [#99-11]).** Carter testified that reassignment from tanker or belly dump work to flatbed work did not occur randomly and was not a routine practice. Instead, Carter explained that such assignments were not random and occurred only if a driver request it, a flatbed trailer is available because its driver called out, and that switching between trailer types was not common. *See* **Carter Decl. ECF #99-11, ¶¶4, 14–15**

Assignments that occurred only when staffing gaps arose and were available only if a driver chose to accept them do not establish that interstate hauling was an ordinary expectation of the position. Instead, such evidence supports the inference that flatbed work functioned as an optional opportunity for belly dump and tanker drivers rather than a routine component of their assigned duties.

Other undisputed facts summarized in the R&R likewise point to distinct operational roles among trailer types. The R&R recognizes that belly dump and tanker drivers transported locally sourced raw materials to the plant, while flatbed drivers delivered finished products to customers, and that only flatbed drivers hauled goods originating outside Texas. *See* **R&R p. 6.** Quikrete also compensated flatbed work differently from tanker and belly dump work. *See* **R&R p. 7.**

Taken together, this evidence permits a reasonable factfinder to conclude that flatbed hauling was a contingent opportunity rather than an ordinary duty for belly dump and tanker drivers. Where the record supports competing inferences on whether interstate hauling was

2

reasonably expected, the issue cannot be resolved as a matter of law at summary judgment.

**2. Objection: "Here, these factors cut against Plaintiffs' argument, and a reasonable fact finder would not find otherwise. It is undisputed that all Quikrete drivers have similar job duties, even if on any given day or during some weeks, only some drivers haul loads involving out-of-state product"** *See* **R&R p. 14.**

Plaintiffs object to the R&R's finding at page 14 that "it is undisputed that all Quikrete drivers have similar job duties," because the summary-judgment record contains substantial evidence that would permit a reasonable factfinder to conclude that belly dump and tanker drivers performed materially different duties from flatbed drivers with no regular exposure to the interstate delivery function.

The evidence reflects that the drivers performed different transportation functions with different exposure to interstate shipments. Flatbed drivers transported finished products from the San Antonio plant to retail customers and distribution locations. By contrast, belly dump and tanker drivers transported locally sourced sand, gravel, and powdered materials from nearby pits and suppliers to the San Antonio facility for use in Quikrete's manufacturing process. Those differences are directly relevant to the MCA inquiry because the exemption turns on whether drivers share duties that expose them to and are required to participate in interstate transportation.

The R&R itself describes these distinct operational roles. Flatbed trailers are used to deliver finished products from the San Antonio plant, including both ready-mix concrete bags manufactured in San Antonio and products shipped from out of state. *See* **R&R p. 5**. Belly dump trailers are used to transport locally sourced sand and gravel from nearby pits to the plant. *Id.* Tanker trailers are used to haul locally sourced powdered materials to the plant where those materials are incorporated into Quikrete's concrete production process before the finished product is later delivered to customers on flatbed trailers. *Id.*

Plaintiffs also submitted the declaration of Julia Frazier, who served as Office Manager

3

and acting Plant Manager at the San Antonio facility during the relevant period and oversaw driver hiring and dispatch coordination. Frazier testified that drivers were hired into distinct positions and that these roles were not interchangeable. Drivers typically remained assigned to their trailer type, and belly dump and tanker drivers were not part of a rotating driver pool performing flatbed deliveries. *See* **Frazier Declaration ECF #99-1 at ¶¶ 25–32**

The R&R also acknowledges that these roles were compensated differently. Drivers hauling flatbed trailers were paid at a lower hourly rate than those hauling tanker or belly dump trailers. *"When employees haul flatbed trailers, they are paid at a lower hourly rate than when they haul tankers or belly dump trailers." See* **R&R p. 7.** A differential pay structure tied to trailer type supports the inference that the duties were not interchangeable.

Viewed in the light most favorable to Plaintiffs, this evidence permits a reasonable factfinder to conclude that belly dump and tanker drivers performed manufacturing-support functions rather than customer-facing delivery work and therefore did not share the same interstate-facing duties as flatbed drivers for purposes of the MCA exemption analysis.

3. **Objection: "Quikrete's driver pool in San Antonio includes drivers who regularly transport out-of-state product"** *See* **R&R p. 14.**

Plaintiffs object to the R&R's characterization at page 14 that Quikrete's driver pool "includes drivers who regularly transport out-of-state product" because the summary judgment evidence, viewed in the light most favorable to Plaintiffs, supports the inference that belly dump and tanker drivers performed intrastate raw-material hauls as their regular duties and accessed flatbed work only voluntarily, contingently, and in rare circumstances. "[B]elly dump and tanker trailers only transported locally sourced raw materials, only those drivers hauling flatbed trailers were involved in the actual transport of products originating outside of the State of Texas" *See* **R&R p. 6.** The R&R acknowledges Plaintiffs' evidence that belly dump and tanker drivers could

decline flatbed work without consequence: "According to several Plaintiffs, each driver could accept a request to pick up a flatbed load or elect to take the day off work without pay—meaning their reassignment was voluntary." *See* **R&R p. 13.** Evidence that a driver could decline the assignment and simply take the day off without consequence permits the inference that flatbed hauling was not an expected or routine component of those drivers' regular duties.

The R&R also notes testimony indicating that cross-assignments occurred only in limited circumstances and only if a driver chose to accept the assignment, such as when a driver's assigned equipment was unavailable or when a flatbed driver was absent. *See* **R&R p. 12-14**.  These circumstances describe contingent opportunities for flatbed work, not routine interstate assignments. The same evidence therefore supports the inference that drivers assigned to belly dump and tanker equipment did not regularly haul out-of-state product and were not ordinarily expected to do so. Because the record permits competing inferences regarding how frequently such work occurred and whether it formed part of those drivers' ordinary duties, the issue cannot properly be treated as undisputed at the summary judgment stage.  Those circumstances describe contingent opportunities for flatbed work rather than routine interstate assignments. Viewed in the light most favorable to Plaintiffs, this evidence permits a reasonable factfinder to conclude that drivers assigned to belly dump and tanker equipment did not regularly haul out-of-state product and were not ordinarily expected to do so.

4. **Objection: "Q***uikrete requires all its driver to meet DOT requirements. This evidence establishes that "the [DOT] had the power to regulate all of [Quikrete's] drivers" because "the existence—rather than the exercise—of that power is the test as to whether the employees were entitled to overtime pay under the FLSA. Songer, 618 F.3d at 474 (emphasis in original)." See* **R&R pg. 14.**

Plaintiffs object to the R&R's conclusion at page 14 that Quikrete's requirement that drivers meet DOT qualifications establishes that the MCA exemption applies to all drivers as a

matter of law, because the summary-judgment record contains evidence that drivers were not subject to mandatory dispatch for interstate work.

Plaintiffs object to the R&R's conclusion that Quikrete's requirement that drivers meet DOT qualifications establishes the Motor Carrier Act exemption as a matter of law. The summary-judgment record contains evidence from which a reasonable factfinder could conclude that drivers were not subject to mandatory dispatch to flatbeds for interstate work. The R&R references *Songer v Dillon Resources, Inc.* for the proposition that the "existence- rather than the exercise — of that power is the test." ***See* R&R p. 14** (quoting *Songer v. Dillon Res., Inc.*, 618 F.3d at 474). The "power" addressed in Songer arose in a materially different operational context. In *Songer*, interstate trips were distributed through the employer's ordinary dispatch system and could be assigned indiscriminately to any driver as part of routine operations. ***Songer v. Dillon Res., Inc.,* 618 F.3d 467, 469 (5th Cir. 2010)**. Drivers were expected to accept dispatch assignments and could face termination if they refused an interstate trip. ***Id.***

That is not what the R&R describes here. The R&R acknowledges testimony indicating that cross-assignments between trailer types occurred only in limited circumstances such as when a driver's assigned equipment was unavailable or when a flatbed driver was absent. ***See* R&R p. 12–14.** Critically, the same testimony reflects that drivers could decline such opportunities and instead take the day off without pay, with no adverse consequences following from that choice. Viewed in the light most favorable to Plaintiffs, that evidence permits the inference that flatbed work was offered as an opportunity rather than imposed through dispatch authority.

This distinction matters because the "power" referenced in *Songer* refers to the employer's authority to require drivers to accept interstate assignments through dispatch. The existence of a power to request work is not the same as the authority to require it. That gap is precisely what

*Olibas* Factor 8 is designed to capture: "whether drivers risk termination for refusing trips from dispatch." *Olibas v. Barclay*, 838 F.3d 442, 448–49 (5th Cir. 2016). The summary-judgment evidence cited above indicates that drivers could decline flatbed assignments without consequence, permitting the inference that no such consequence existed here.

Viewed in the light most favorable to Plaintiffs, the record permits a reasonable factfinder to conclude that Quikrete's cross-assignment practice reflected voluntary opportunities rather than mandatory dispatch authority. From this evidence, a reasonable factfinder could conclude that the mere existence of DOT qualification requirements did not translate into a practical expectation that these drivers would haul interstate loads in the ordinary course of their work. Because the record is sufficient for a reasonable jury to find in favor of the nonmoving party, the issue cannot be resolved as a matter of law at the summary-judgment stage. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

5. **Objection: "Moreover, there is undisputed evidence that there were other reasons aside form a belly dump or tanker truck being in the shop for driver reassignments. Plaintiff Eunice Carter stated in her declaration that, although there were not typically reassignments between trailer types on a daily basis, Quikrete would reassign belly dump and tanker drivers to flatbed trailers if a flatbed driver called out sick and there were not enough flatbed drivers available. (Carter Decl. [#99-11], at ¶ 14.)"** *See* **R&R p. 14.**

Plaintiffs respectfully object to the R&R's finding at page 14 that because the summary-judgment record contains multiple declarations disputing that cross-assignments between trailer types occurred for those reasons. ***See*** **Godoy Declaration ECF #99-7 at ¶ 14–17, 22; Lopez Declaration ECF #99-8 at ¶ 13–18; Yanez Declaration ECF #99-4 at ¶ 19–23; Bell Declaration ECF #99-3 at ¶ 11–13, 16; Montoya Declaration ECF #99-2 at ¶ 4–7; Rios Declaration ECF #99-6 at ¶ 4–8; Cantu Declaration ECF #99-5 at ¶ 16–21; Thomas Declaration ECF #99-10 at ¶ 11–16, 24–30.** This finding is erroneous because the summary-

judgment record contains substantial Plaintiffs' evidence that directly disputes this finding, and the R&R's characterization of that evidence as undisputed improperly resolved genuine factual conflicts in Quikrete's favor at the summary judgment stage.

Carter's declaration directly and structurally contradicts the Sanders and McSherry assertion that belly dump drivers could be called on to haul flatbed loads when vendors closed for holidays or hurricanes increased orders. Carter testified that flatbed trucks were already assigned to dedicated flatbed drivers and could only become available if a flatbed driver called out, and even then, only if the belly dump driver first approached management to ask about availability. *See* **Carter Decl. ECF #99-11, at ¶¶ 4–5, 14** No triggering event, whether a vendor holiday closure or a hurricane-driven order spike, would cause a flatbed driver to call out sick, and therefore no such event could have satisfied the availability precondition Carter identified as the threshold requirement for a Belly Dump driver to drive a flatbed to occur. Carter further confirmed that drivers were assigned to a specific trailer type and remained in that position unless they received approval and training to switch, that Quikrete had a policy of treating flatbed driving as a separate job, that all flatbed trucks were leased and already assigned to a flatbed driver, that Quikrete "did not randomly reassign Tanker Driver/Belly Dump Drivers to drive flatbed" and it "only happened if someone called out for work and there was a Flatbed available" and that switch between trailer types "was not common or routine" and "simply was not the practice at the San Antonio plant." (*Id*. at ¶¶ 11–15.)

A reasonable factfinder comparing Carter's account could conclude that the holiday and hurricane reassignment practice alongside Sanders and McSherry describe either never existed or was structurally impossible given the truck availability constraints Carter identified. The summary judgment evidence shows that not only did the driver's not switch trailer, the Tanker and Belly

Dump drivers would only drive a flatbed if their truck was in the shop, they wanted to drive a flatbed instead of going home, and a flatbed was available. *See* **Frazier Decl. ECF #99-1 at ¶ 36, 38, 39; Godoy Decl. ECF #99-7 at ¶ 17, 18, 22, and 26, Lopez Decl. ECF #99-8], at ¶ 19, Burrs Decl. ECF #99-9, at ¶ 9,  Montoya Decl. ECF #99-2, at ¶ 7, and Rios Decl. ECF #99-6, at ¶ 8**. The R&R's assertion that "none of Plaintiffs' witnesses" disputed this testimony is therefore not supported by the record.

At the summary-judgment stage, courts must draw all reasonable inferences in favor of the nonmoving party and may not adopt the movant's preferred interpretation of the nonmovant's evidence. By relying on Carter's testimony as support for Quikrete's position while disregarding its limiting language, the R&R effectively resolves competing interpretations of Plaintiffs' evidence in the movant's favor an inquiry reserved for the trier of fact. Because Carter's testimony permits competing inferences regarding the frequency and circumstances of cross-trailer reassignment, it cannot properly be treated as undisputed evidence establishing Quikrete's position as a matter of law.

6. **Objection: "And none of Plaintiffs' witnesses have disputed Quikrete's witnesses' testimony that belly dump or tanker drivers could be called on to haul flatbed trailers when Quikrete's raw materials vendors were closed for holidays or when there are weather events like hurricanes leading to increased orders." *See* R&R pg. 14.**

 Plaintiffs object to the R&R's statement at page 14 that "none of Plaintiffs' witnesses" disputed the holiday and hurricane reassignment claim, because sworn declarations from Frazier, Godoy, Lopez, Burrs, Montoya, and Rios each directly addressing and denying any demand-triggered reassignment practice constitute precisely the disputed testimony the R&R failed to acknowledge.

First, Plaintiffs presented testimony from the employee responsible for dispatch decisions

during the relevant period. In her declaration, Frazier explained that when she was the acting plant manager at the San Antonio plant, cross-assignments between trailer types occurred when a driver's assigned truck was unavailable due to maintenance downtime. *See* **Frazier Decl. ECF #99-1 ¶ 36; and R&R p. 12.** Frazier does not identify holidays, hurricanes, or other external events as reasons she reassigned belly-dump or tanker drivers to flatbed work. Because Frazier supervised the dispatch staff, coordinated driver staffing, and oversaw day-to-day plant operations, her description of when cross-trailer reassignment occurred directly contradicts Quikrete's broader account that such reassignments were commonly triggered by holidays or weather events. *See* **Frazier Decl. ECF #99-1 ¶ 5 and 8**

Second, the R&R acknowledges evidence that drivers could decline reassignment to flatbed work. The R&R states:

> *"Plaintiffs argue that all Quikrete drivers were not reasonably expected to haul flatbed loads because, prior to the alleged policy change, belly dump and tanker drivers had a choice whether to accept a flatbed assignment when their truck was down for maintenance… each driver could accept a request to pick up a flatbed load or elect to take the day off work without pay."* *See* **R&R p. 13**

Evidence that belly dump and tanker drivers could refuse flatbed assignments permits the inference that such work was voluntary rather than an expected job duty.

Third, Plaintiff Eunice Carter testified that switching between trailer types was rare and conditional. Carter explained that belly dump or tanker drivers hauling flatbed loads occurred only on "very few occasions," typically when multiple flatbed drivers called out and a flatbed was available. Carter further stated that switching between trailer types "was not common or routine" and that any flatbed work occurred only if a driver voluntarily asked to do it. *See* **Carter Decl. ECF #99-11, ¶ 14-15**

This testimony permits competing inferences regarding when and under what

10

circumstances cross-trailer assignments occurred. The R&R's statement that none of Plaintiffs' witnesses disputed Quikrete's explanation effectively credits one account of the evidence over another.

Drivers could decline reassignment and instead take the day off without pay, a reasonable factfinder could infer that flatbed hauling was voluntary rather than an expected job duty. That inference directly undermines the R&R's conclusion that belly dump and tanker drivers could be "called on" to perform such work in a manner sufficient to establish a reasonable expectation of interstate transportation for purposes of the MCA exemption.

Because Plaintiffs' evidence presents a different account of when reassignment occurred and whether such work was expected or voluntary, the issue cannot properly be treated as undisputed.

7.  **Objection: "In sum, the summary-judgment evidence establishes that there were several reasons that drivers typically assigned to haul belly dump and tanker trailers would be asked to drive flatbed loads containing out-of-state product, and that many of the Plaintiffs in this suit did in fact perform such work during the relevant period."** *See* **R&R pg. 15.**

Plaintiffs object to the R&R's finding at page 15 that the evidence establishes drivers "would be asked" to haul flatbed loads because the Report resolves a disputed factual issue in Quikrete's favor at the summary judgment stage. The R&R accepts Quikrete's characterization of the evidence while failing to account for summary judgment evidence that flatbed work was offered as a voluntary option rather than reassigned as a required duty. The record cited in the R&R therefore reflects competing evidence regarding whether belly dump and tanker drivers were expected to perform flatbed deliveries, yet the R&R treats Quikrete's interpretation of those facts as undisputed.

This conclusion assumes that the circumstances described in the record reflect

11

reassignments that drivers were expected to perform. But much of the evidence cited in the R&R describes situations where flatbed work was offered to drivers or available under certain conditions, rather than reassigned as a mandatory duty. The R&R's conclusion does not address that distinction. By treating these circumstances as reasons drivers "would be asked" to perform flatbed work, the R&R effectively converts optional or situational opportunities into evidence of a standing expectation that belly dump or tanker drivers would perform interstate transportation.

A reasonable factfinder could interpret the same evidence differently namely, that flatbed work was occasionally available but not an expected component of the job. Because the evidence permits competing interpretations regarding whether interstate hauling was a regular expectation or merely an optional opportunity, the issue should not be resolved on summary judgment.

8. **Objection: "Plaintiffs' summary-judgment evidence includes the declaration of Julia Frazier, who served as Office Manager and acting Plant Manager from February 2020 until March 2023 (during the relevant period)...Frazier testified that as acting Plant Manager, she never saw Quikrete use past sales history or future sales forecasts to determine how much of a given product to ship in from out of state, and there was no documentation or system that linked inventory restocking to pending or anticipated customer orders. (*Id*. at ¶¶ 13, 17.) Instead, per Frazier, the plant maintained what was internally referred to as a "baseline stock level" or "replenishment threshold" set annually by corporate manager that did not materially change from year to year during her tenure." *See* R&R pg. 26.**

Plaintiffs object to the R&R's treatment of the conflicting testimony of Julia Frazier and Don Sanders because resolving that conflict requires weighing the credibility of competing declarants and on a material fact issue that cannot be resolved at the summary judgment stage.

The R&R then notes Quikrete's response that Frazier's testimony should be disregarded. As summarized in the Report, Sanders's testified that Frazier was "(1) never appointed to serve as interim or acting Plant Manager; (2) was never involved in Quikrete's forecasting process so never received copies of forecasts; and (3) was never responsible for any inventory planning. (Sanders Second Supp. Decl. [#108-1], at ¶¶ 4, 7–8.)" *See* **R&R p. 26.**

This creates a direct conflict between two declarants with knowledge of the plant's operations. Frazier describes the inventory restocking practices she observed while overseeing internal plant operations during the relevant period, while Sanders disputes the scope of her role and involvement in forecasting.  Although the R&R does not expressly resolve this conflict, its analysis effectively discounts Frazier's testimony by relying on Sanders' declaration to diminish the significance of her observations. Resolving how much weight to give each witness's testimony, however, is a credibility determination that cannot be made at the summary-judgment stage.

Frazier's declaration creates a genuine dispute regarding whether shipments to the San Antonio plant were based on forecasts of customer demand or instead on static baseline inventory levels. That dispute goes directly to Factor 1, which the R&R itself identifies as "the primary factual dispute between the parties." *See* **R&R p. 22.** Such a conflict of facts cannot be resolved as a matter of law on summary judgment.

The R&R also cites Quikrete's Product Report as support for the existence of forecast-based shipment planning. *See* **R&R p. 23** (citing Product Report [#98-26], at 5–15). But the report merely summarizes the units of certain Quikrete products sold during each of the three years in the relevant period. It lists sales totals for a limited set of product offerings and does not explain how inbound shipment quantities were determined or whether those sales figures were used to forecast inventory needs. Standing alone, the report demonstrates only historical sales totals for a very small percentage of the warehouse's offerings, not the decision-making process governing inbound shipments. Treating that limited sales summary as evidence resolving the forecasting dispute further illustrates that the R&R weighs competing evidence rather than identifying the absence of a genuine factual dispute.

9.  **Objection: "Even if a reasonable factfinder could find that this factor cuts in favor of Plaintiffs' position, a reasonable factfinder would still conclude, based on the**

**weight of the other factors and the totality of the circumstances, that the goods retain their interstate character."** *See* **R&R p. 27**

Plaintiffs object to the R&R's conclusion at page 27 it resolves a disputed factual issue by weighing competing evidence rather than determining whether a genuine dispute of material fact exists. Earlier in the same analysis, the R&R describes Factor one, whether inbound shipments were based on projections of customer demand with a factual basis as "the primary factual dispute between the parties." *See* **R&R p. 22** The R&R also summarizes Plaintiffs' evidence on this issue, including Julia Frazier's testimony that she never observed Quikrete uses sales history or demand forecasting to determine inbound shipments and that the plant instead maintained static "baseline stock level" set annually by corporate management that did not change during her tenure. *See* **R&R p. 26** Factor 1 is not satisfied because the record evidence shows Quikrete's shipments were driven by baseline inventory replenishment, not by projections of customer demand with a factual basis as Factor 1 expressly requires. Factor 1 demands more than a general plan to keep shelves stocked. It requires that the shipper base its determination on "projections of customer demand that have some factual basis" including historical sales data, actual present orders, or relevant market surveys of need. Maintaining a static baseline stock level or replenishment threshold set annually by corporate management that does not materially change from year to year is not a projection of customer demand. It is a plan to maintain inventory for sale to unknown future purchasers. This is the kind of scenario Factor 1 is designed to exclude. Frazier testified that there was no documentation or system linking inventory restocking to pending or anticipated customer orders. *See* **Frazier Decl. ECF #99-1, at ¶¶ 14** When goods arrive at a warehouse to replenish a fixed inventory level without a designated customer or a demand-based forecast connecting the shipment to an identified need, those goods come to rest at the warehouse and any subsequent delivery constitutes a new intrastate movement.

14

The summary judgment record further underscores the dispute. Quikrete produced a single forecast document covering only a limited subset of products, and the record contains no evidence linking that document to the actual inbound shipments of out of state products. ***See* Sanders Decl. ECF #98-26, at 5–15**   Nor does the record show that the forecast was used to determine shipment quantities or destinations for the San Antonio facility. This evidence permits a reasonable factfinder to conclude that inbound shipments were driven by inventory maintenance rather than customer demand projections. The R&R therefore acknowledges that a reasonable factfinder could conclude that Factor 1 favors Plaintiffs. Under Rule 56, a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2508 (1986). Once the court recognizes that a reasonable factfinder could resolve a material factual issue in Plaintiff's favor, summary judgment is improper.

Rather than treating that dispute as precluding summary judgment, however, the R&R proceeds to weigh Factor 1 against the remaining factors and concludes that the overall balance favors Quikrete. That approach effectively treats the central factual dispute as merely one factor in a broader balancing analysis. But Rule 56 does not permit the court to resolve competing inferences in that manner. As the Supreme Court has explained, the judge's function at summary judgment "is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." ***Id*. at 249.**

Because the R&R acknowledges that a reasonable factfinder could determine that Factor 1 favors Plaintiffs, and because the R&R itself identifies Factor 1 as the primary factual dispute in the case, the issue cannot properly be resolved as a matter of law on summary judgment.

That dispute bears directly on whether Quikrete's inbound shipments were made pursuant

to a fixed and persistent intent to serve specific customers or instead were sent to the San Antonio facility for indefinite storage pending future orders. Where the evidence permits a reasonable finding that shipments were driven by baseline inventory levels rather than customer-specific demand, the interstate movement may be deemed to have ended at the warehouse, making summary judgment inappropriate.

10. **Objection: "As to the interstate commerce requirement, the factors identified in the 1992 Policy Statement as a matter of law weigh in favor of finding that Quikrete had the fixed and persistent intent to deliver its out-of-state products to its existing customers in the San Antonio area. None of the evidence presented by Plaintiffs would allow a reasonable factfinder to reach the opposite conclusion, even assuming the evidence generates a fact dispute on one or two factors."** *See* **R&R, p. 24**

Plaintiffs respectfully object to this finding because the R&R concludes that the 1992 Policy Statement factors establish "as a matter of law" that Quikrete possessed the required fixed and persistent intent, because that conclusion requires the court to weigh factors it simultaneously acknowledges are in genuine dispute, substituting judicial balancing for the factfinder's role. This conclusion rests on a determination that the 1992 Policy Statement factors resolve the fixed-intent issue "as a matter of law," even while acknowledging that Plaintiffs' evidence may generate factual disputes on some of those factors. The R&R elsewhere identifies Factor 1, forecasting or projections of customer demand as the "primary factual dispute between the parties." *See* **R&R p. 22.**

Once the analysis recognizes that a reasonable factfinder could interpret evidence regarding one or more factors differently, the conclusion that the overall interstate-commerce question is resolved "as a matter of law" necessarily depends on weighing the competing evidence across the remaining factors. The R&R effectively does so by acknowledging that Plaintiffs' evidence could support a different finding on at least one factor, yet concluding that the remaining factors

16

outweigh that dispute. The record also shows factual issues on the fixed and persistent intent. ***See***

**Objection 9**

Because the R&R recognizes that at least one of the relevant factors presents a genuine factual dispute indeed, the "primary factual dispute between the parties" the interstate-commerce question cannot be resolved as a matter of law. The weighing of those factors and the determination of Quikrete's intent must therefore be left to the factfinder.

> **11. Objection: "Additionally, it is undisputed that Quikrete uses a modern inventory system, JD Edwards, to track its shipments and inventory levels (Factor Four)...This factor also weighs in favor of finding the character of the shipments to be interstate"** ***See*** **R&R p. 22**

Plaintiffs object to the R&R's finding above as this finding is not supported by the summary judgment record. Factor 4 requires that "modern tracking systems allow tracking and documentation of most, if not all, of the shipments coming in and going out of the warehouse or distribution center." The R&R found Factor 4 satisfied based on an inventory system that Quikrete concedes only tracks items through arrival at the San Antonio plant and does not follow those same items leave the warehouse for delivery. ***See*** **R&R p. 22** That internal contradiction in the R&R's own reasoning is, at minimum, a genuine factual dispute that cannot be resolved in Quikrete's favor at summary judgment. The R&R's Factor 4 analysis also fails to consider Frazier's directly relevant testimony. The R&R itself acknowledges at page 26 that Frazier testified "there was no documentation or system that linked inventory restocking to pending or anticipated customer orders." ***See*** **Frazier Decl. ECF #99-1, at ¶¶ 13, 17** Frazier, as the acting Plant Manager with firsthand operational knowledge, testified that the plant instead maintained a static "baseline stock level" set annually by corporate management that did not materially change year to year. ***See*** **Frazier Decl. ECF #99-1, ¶¶18-20** This directly contradicts the premise that JD Edwards is a "Modern tracking systems allow tracking and documentation of most, if not all, of the shipments

coming in and going out of the warehouse or distribution center". Frazier's testimony (which the R&R acknowledges elsewhere but does not address in its Factor 4 analysis creates a genuine factual dispute over what the Quikrete's "modern tracking system" actually did in practice and if it even meets the "continuous stream of interstate commerce" inquiry.

At minimum, the evidence permits competing inferences regarding whether Quikrete's inventory system supports the interstate character of the shipments. Because those competing inferences must be resolved in favor of the nonmovant at summary judgment, Factor 4 should not be treated as weighing in Quikrete's favor as a matter of law.

12. **Objection: "There is therefore no genuine dispute of material fact that Quikrete, by transporting out-of-state product from its San Antonio plant to local customers, was engaged in the continuous flow of interstate commerce. Quikrete has satisfied its burden to demonstrate that both elements of the MCA exemption apply and that Plaintiffs were properly classified as exempt from the overtime-compensation requirements of the FLSA."** *See* **R&R p. 27**

Plaintiffs object to the R&R's ultimate conclusion at page 27 that there is "no genuine dispute of material fact" regarding interstate commerce, because that conclusion is internally inconsistent with the R&R's own identification of the forecasting dispute as "the primary factual dispute between the parties" and its concession that a reasonable factfinder could resolve it in Plaintiffs' favor. *See* **R&R p. 22, 27** That conclusion is inconsistent with the R&R's own description of the record. Earlier in the analysis, the R&R expressly recognizes that the parties dispute whether Quikrete's shipments were driven by forecasted customer demand or merely by general inventory practices. The R&R identifies that issue as "the primary factual dispute between the parties." *See* **R&R p. 22**

The R&R further acknowledges that the evidence could permit a factfinder to resolve that issue in Plaintiffs' favor, stating:

> *"Even if a reasonable factfinder could find that this factor cuts in favor of Plaintiffs'*

*position, a reasonable factfinder would still conclude, based on the weight of the other factors and the totality of the circumstances, that the goods retain their interstate character." See* **R&R p. 27**

These statements concede the existence of a genuine dispute of material fact. If "a reasonable factfinder could find" that the first factor favors Plaintiffs and the R&R itself characterizes that factor as the primary factual dispute in the case, then the record necessarily contains competing evidence the jury could weigh differently.

The R&R's reasoning confirms as much. In evaluating Factor 1, the R&R credits Quikrete's declarations from Sanders and other employees asserting that shipment volumes were tied to projected customer demand. Plaintiffs however offered contrary evidence, including testimony from Frazier stating that Quikrete did not use forecast-driven projections to direct shipments towards known customers. *See* **Frazier Decl. ECF #99-1, ¶ 13–20, and 22–24**. A reasonable factfinder could credit that testimony and reject Quikrete's characterization of its shipment practices.

The summary-judgment inquiry asks only whether the record presents a genuine issue for trial. Where the evidence permits more than one reasonable interpretation, the dispute is ordinarily resolved by the trier of fact rather than through judicial balancing at summary judgment.

The R&R effectively acknowledges this dispute by recognizing that a reasonable factfinder could conclude that Factor 1, the factor it identifies as the primary factual dispute, cuts in Plaintiffs' favor. It then proceeds to weigh the remaining factors and concludes that the overall balance favors Quikrete. Because the MCA exemption analysis turns on a totality-of-the-circumstances inquiry, the presence of a genuine dispute as to one of the central factors within that framework is sufficient to preclude summary judgment. The summary-judgment inquiry asks only whether the record presents a genuine issue for trial. Where the evidence permits more than one reasonable

19

interpretation of how the factors should be evaluated, the dispute is ordinarily resolved through factfinding rather than judicial balancing at summary judgment.

13. **Objection: "In sum, Plaintiffs are judicially estopped from arguing that the resolution of the parties' dispute over the MCA exemption requires an individualized inquiry."** *See* **R&R p. 11**

Plaintiffs respectfully object to the R&R's judicial estoppel ruling because Plaintiffs are not advocating for the individualized, driver-by-driver inquiry the R&R describes. *See* **R&R p. 7-11.**

As an initial matter, Plaintiffs wish to clarify that the R&R's characterization of their summary judgment position does not accurately reflect what Plaintiffs argued. Plaintiffs are not advocating for the individualized, driver-by-driver inquiry the R&R describes. Plaintiffs' position at summary judgment is the same as it was at the notice stage, that the MCA exemption can and should be decided on a class-wide basis. The only refinement is that a class-wide analysis should recognize three operationally distinct groups: flatbed drivers, belly dump drivers, and tanker drivers. Each group is still evaluated collectively, not individually. That is not an abandonment of collective treatment, it is the application of collective treatment to a fully developed merits record.

The Magistrate Judge provided in her prior order granting notice that "the parties agree here that Quikrete's drivers are similarly situated as to their duties and compensation and that the merits of this case can be decided collectively." *See* **Order ECF 58, at 4** Plaintiffs respectfully submit that this statement cannot be read in isolation. The same order, on the very next page, states: "Regardless of any distinctions in the types of truck beds and loads hired by various class members, the existence of subgroups within the class does not preclude collective treatment." *See* **Order ECF 58, at 5.**

Because both orders were issued by the same Magistrate Judge, this language is particularly

significant. The notice order expressly acknowledged that subgroup distinctions existed in the record and that they remained compatible with collective proceedings. The acceptance of Plaintiffs' motion therefore cannot fairly be characterized as acceptance of a proposition that subgroup distinctions were irrelevant to the ultimate merits determination, the order itself says otherwise. Plaintiffs' later argument that the MCA exemption fails as to belly dump and tanker drivers is fully consistent with a notice order that preserved, rather than resolved, exactly that question.

The factual distinction between what each subgroup hauled was not hidden or withheld. To the contrary, Plaintiffs disclosed it expressly in the notice motion: "The Belly Dump Drivers hauled sand and gravel from local quarries to Quikrete's San Antonio Plant...Tanker Drivers only transported powder from a nearby quarry to Quikrete's Plant in San Antonio...Flatbed Drivers only made local deliveries." *See* **Plaintiff's Mot. for Notice ECF #42, at 10.**

Furthermore, the notice order expressly acknowledged that "While Quikrete may have all evidence it needs at this point to file and support its motion for summary judgment, Thomas may not have the evidence it needs to respond and is entitled to conduct additional discovery on the application of the Motor Carrier Act exemption before being required to file a response to Quikrete's pending motion for summary judgment." *See* **Order ECF #58, at 6** It would be inconsistent with that reasoning to now conclude that Plaintiffs were bound at the notice stage to positions that would foreclose arguments based on the discovery the Court allowed to proceed. Plaintiffs' later argument that the MCA exemption fails as to belly dump and tanker drivers is fully consistent with a notice order that preserved, rather than resolved, that issue for development through discovery.

Critically, at the notice stage, the MCA question was framed broadly. As Plaintiffs described it in their notice motion, the central dispute was whether "the intrastate routes Plaintiffs

21

drive could reasonably be viewed as being part of a continuous interstate journey of the materials Plaintiffs are tasked with moving," with Plaintiffs contending that their drivers "did not have the interstate commerce connection the Motor Carriers Act requires." ***See* Plaintiff's Mot. for Notice ECF #42, at 11-12** In other words, whether Quikrete's drivers, as drivers for an interstate seller who only drove within Texas, could be said to be part of a continuous interstate journey at all. That was the dispute as both parties understood it at the time whether driving intrastate routes for a company that sells products across state lines is sufficient to invoke the MCA exemption at all. That is a different and broader legal question than the one that became central at summary judgment. Namely, whether the specific goods hauled by each subgroup had any interstate origin or character under the fixed-and-persisting-intent test and the seven-factor framework from the 1992 Policy Statement. The fixed-and-persisting-intent test, that seven-factor analysis, and the specific supply chain evidence regarding how out-of-state products moved through the San Antonio plant all became the organizing framework of the case only after full merits discovery was completed. That framework, and the evidentiary record surrounding it, only came into full focus after the Court ordered merits discovery and the parties took depositions of plant managers, corporate representatives, and the opt-in plaintiffs themselves.  For these reasons, the Plaintiffs object to the application of judicial estoppel.

For all the above reasons, the Court should sustain Plaintiffs objections.

Respectfully submitted,

**TRAN LAW FIRM**


_/s/ Trang Q. Tran_
TRANG Q. TRAN
Federal I.D: 20361
Texas Bar No. 00795787
800 Town and Country Blvd. Suite 500
Houston, Texas 77024
Ph.: (713) 223 – 8855
trang@tranlf.com
service@tranlf.com

**ATTORNEY FOR PLAINTIFF, individually and on behalf of similarly situated**


## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing was forwarded on March 13, 2026, to all counsel of record via the Court's CM/ECF system.


/s/ _Trang Q. Tran_
Trang Q. Tran


23